UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
D.D-S., Individually and as Parent
and Next Friend to B.D-S., a Child
with a Disability,

                    Plaintiff,

                                              MEMORANDUM & ORDER
          -against-                           09-CV-5026(JS)(WDW)

SOUTHOLD UNION FREE SCHOOL DISTRICT,

                    Defendant.
--------------------------------------X
APPEARANCES:
For Plaintiff:     Andrew K. Cuddy, Esq.
                   Law Office of Andrew K. Cuddy
                   145 E. Genesee Street
                   Auburn, NY 13021

For Defendant:     Christopher F. Venator, Esq.
                   Susan E. Fine, Esq.
                   Ingerman Smith, LLP
                   150 Motor Parkway, Suite 400
                   Hauppauge, NY 11788

SEYBERT, District Judge:

          Plaintiff D.D-S., individually and as parent and next

friend to B.D-S., a child with a disability, commenced the

instant action pursuant to the Individuals With Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. Specifically,

Plaintiff challenges the October 8, 2009 decision of the New

York State Review Officer ("SRO") denying her request to be

reimbursed for her daughter's tuition costs at the Landmark

School ("Landmark") for the 2007-2008 and 2008-2009 school years

and to receive compensatory educational services based on

Defendant Southold Union Free School District's ("Defendant," "District," or "Southold") refusal to offer extended school year services ("ESY") during the summer of 2008.

Pending before the Court is Plaintiff's motion for summary judgment in which she asks the Court to vacate the decision and order of the SRO and award tuition reimbursement for the 2007-2008 and 2008-2009 school years as well as additional services for failure to offer an ESY program for summer 2008. Also pending is Defendant's cross-motion for summary judgment.

For the following reasons, the Court affirms the decision of the SRO. As such, Plaintiff's motion for summary judgment is DENIED, and Defendant's cross-motion for summary judgment is GRANTED.

<u>BACKGROUND</u>

I.   <u>Statutory Framework</u>

"Congress enacted the IDEA to promote the education of children with disabilities, 'to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs [and] . . . to ensure that the rights of children with disabilities and parents of such children are protected.'" <u>Frank G. v. Bd. of Educ.</u>, 459 F.3d 356, 363 (2d Cir. 2006) (alteration in original) (quoting 20

U.S.C. § 1400(d)(1)).  "Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'"  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A); Bd. of Educ. v. Rowley, 458 U.S. 176, 180-81, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)).

"The particular educational needs of a disabled child and the services required to meet those needs must be set forth at least annually in a written [individualized education program ("IEP")]."  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (citation omitted).  "In New York, local committees on special education ("CSEs") are responsible for determining whether a child should be classified as eligible for educational services under the IDEA and, if so, for developing an appropriate IEP for that child."  S.H. v. N.Y. City Dep't of Educ., No. 09-CV-6072, 2011 WL 609885, at *1 (S.D.N.Y. Feb. 18, 2011) (citing Walczak, 142 F.3d at 123).

"Parents who believe that their school district has failed to provide their child with a free appropriate public education ('FAPE')--due to an inadequate IEP or otherwise--may file a complaint with the state educational agency and request an impartial due process hearing before a hearing officer."  Id. at *1 (citing Walczak, 142 F.3d at 123).  The impartial hearing officer's ("IHO") decision may be appealed to an SRO, see 20

U.S.C. § 1415(g), "after which any party still aggrieved may sue in either state or federal court," Walczak, 142 F.3d at 122; accord 20 U.S.C. § 1415(i)(2); S.H., 2011 WL 609885, at *1.

II.  Factual Background[1]

B.D-S., a child with "a long-standing history of developmental and learning problems"[2] (Pl. Ex. P-D(1), at 1), received a public education in the District's schools up through and including sixth grade (Tr. 37-38; Cuddy Aff. ¶ 22).  During the summer of 2006, B.D-S. attended a program at Landmark at the District's expense.[3]  D.D-S. then unilaterally placed B.D-S. at Landmark for the 2006-2007 school year and sought reimbursement from the District.[4]

Landmark is a private school located in Prides Crossing, Massachusetts, for children grades 3-12 that have average or above-average IQs and are diagnosed with a language-based learning disability.  (Tr. 579-81.)  The school offers residential and day programs.  (Tr. 582.)  The residential program is only available for grades 9-12, although many eighth

---

[1] The following facts are drawn exclusively from the record before the IHO and SRO.

[2] During all relevant times, B.D-S. was classified as learning disabled because she has a language-based learning disability. Her classification is not in dispute.

[3] The parties dispute whether this summer program was ESY or academic intervention services ("AIS").

[4] Any issues involving the 2006-2007 year are not before the Court.  The details are included merely to provide a full narrative.

grade students dorm at the high school.  (Tr. 582, 606.)  There are approximately 300 students in the high school program, with the majority enrolled as residential students.  (Tr. 579.) Residential students' schedules are managed from the moment they wake up to the moment they go to bed.  (Tr. 583-84, 689-90.) The average class size is very small, ranging from 5-8 students, and most students receive at least some 1:1 training or tutorial.  Landmark's focus is on remediation, not accommodation; however, the ultimate goal is not necessarily to get a student back in the public school system.  (Tr. 579, 609-10.)

A.  Development of 2007-2008 IEP

On June 15, 2007, the CSE convened to conduct B.D-S.'s annual review and to develop her IEP for the 2007-2008 school year.  (Cuddy Aff. ¶ 29; Fine Aff. ¶ 39; Pl. Ex. P-B(6), at 1.) In attendance from Southold were Ginny Thompson, CSE Director; the school psychologist; Southold's special education teachers and an additional parent member.  (Pl. Ex. H, at 1.)  In attendance from Landmark were Karl Pulkinnen, the public-school liaison, B.D-S.'s case manager, and five of her teachers: Jennifer Carr, Scott Harlan, Julia Littlefield, Richard Mangano, and Lisa Nichols.  (Id.)  D.D-S., B.D-S. and four of their family friends also attended the meeting.  (Id.)  Before it began, Landmark provided the District with a Student Report,

5

dated January 12, 2007, which included progress reports prepared by B.D-S.'s Landmark teachers during the 2006-2007 year (Def. Ex. D-7; Tr. 279-80), as well as a draft IEP, results of tests that Landmark administered, and samples of work B.D-S. completed while at Landmark (Def. Exs. 11-13; Tr. 281-84).

At the meeting, the CSE performed a "page by page" review of Landmark's draft IEP. After hearing brief statements from D.D-S. and B.D-S. regarding their concerns for the upcoming school year, the CSE reviewed and discussed B.D-S.'s strengths, interests, personal attributes and accomplishments listed on the draft IEP, making minor additions and changes to the draft along the way. (Pl. Ex. P-H, at 3-6.) The representatives from the District, although present, did not contribute at all to the discussion. The CSE then reviewed B.D-S.'s academic test scores, which reflected improvement in "word identification, work attack, reading rate, reading accuracy, passage fluency, spelling, reading vocabulary, reading comprehension, mathematics problem solving, and mathematics procedures." Application of a Child With a Disability, Appeal No. 09-088, at 3 (citing Pl. Ex. P-H, at 6-9; Def. Ex. 11, at 3). No one from the District had any questions, but Ms. Thompson commented that they were "solid scores," and that B.D-S. had made "tremendous progress." (Pl. Ex. P-H, at 8.) B.D-S.'s Landmark teachers then presented her current performance level in each of their respective courses,

6

and the CSE discussed each of the suggested annual goals and benchmarks as set out in the draft IEP.  (Tr. 791-94; Def. Ex. D-11, at 3-9; Pl. Ex. P-H, at 10-32.)  Again, no one from the District had any questions or contributed anything to the discussion.  (Tr. 793; Pl. Ex. P-H.)[5]  On the other hand, D.D-S. and B.D-S. both contributed significantly to the discussions by asking questions and providing feedback.  (See generally Pl. Ex. P-H.)  Mr. Pulkinnen then described how Landmark would implement services and programs to address B.D-S.'s needs and goals.  (Id. at 32-33.)

Ms. Thompson responded with the CSE's recommendation: "a return to district." (Id. at 33.)  She proposed that B.D-S. be placed in "inclusion" classes--classes comprised of approximately 20-23 students, no more than a third of whom would be special education students, with a regular education teacher and a special education teacher in the room at all times.  (Id.)

_____

[5] Mr. Pulkinnen testified:

> The Landmark teachers presented the current performance information and [Mr. Pulkinnen] asked everybody on the team, including the Southold folks, to look at the suggested annual goals and the benchmarks and review those together and ask any questions or come to an agreement that these were appropriate goals and benchmarks.  We did so for each goal area and each subject.

(Tr. 792-93.)

Ms. Thompson's proposal also included a daily 1:1 reading tutorial and daily resource room, in addition to use of Kurtzweil software on a laptop computer and the Read Naturally program. (<u>Id.</u> at 33-34.) Although the District recommended a different setting, the goals in the final IEP would mirror the goals in Landmark's draft. (<u>Id.</u> at 34.)

Finally, Ms. Thompson stated that "it's extremely important that [B.D-S.] be exposed to the traditional school setting," and "her scores do not support anything other than the public school as the least restrictive environment." (<u>Id.</u> at 33-34.) D.D-S. objected, at length, expressing disagreement with the District's decision to recommend placement at Southold. (<u>Id.</u> at 33-41.)

The CSE then briefly discussed B.D-S.'s eligibility for ESY, and the District concluded that her test scores made her ineligible. (<u>Id.</u> at 42-48.)

The content of the final IEP reflected what was discussed at the meeting: enrollment in inclusion classes with daily resource room, 1:1 reading tutorial, use of a graphic organizer and the "Inspiration Software" computer program, modified homework assignments and testing conditions, use of an auditory enhancer ("FM" unit or system), and use of a laptop with Kurzweil and Read Naturally software. (Pl. Ex. P-B(6), at 1-2, 6.)

8

On July 2, 2007, the District forwarded a copy of the updated and final IEP for the 2007-2008 school year to D.D-S. with a consent form for her to send back indicating whether or not she agreed with the District's recommendations. (Def. Ex. D-16.) D.D-S. met with the District on July 16, 2007[6] and expressed concern regarding the content of the IEP stating that she did not believe that it "exactly reflect[ed] the meeting." Application of a Child With a Disability, Appeal No. 09-088, at 6 (quoting Pl. Ex. P-RR). In response, the District agreed to secure and fund updated neuropsychological and auditory and language processing evaluations and to reconvene at a later date to discuss what had been allegedly "left out" of the IEP. Id.

B.   Updated Evaluations

B.D-S. was evaluated by neuropsychologist Dr. Herman Davidovicz on August 8-9, 2007. He found that B.D-S.'s general abilities, according to one test, were in the bright-normal range in the 90th percentile. (Pl. Ex. P-D(1), at 3.) However, she did demonstrate difficulty with working memory, organization, planning skills, and reading rate. (Id. at 3-5.) He recommended (i) extended time for homework and testing; (ii)

---

[6] The meeting was a resolution session convened in response to D.D-S.'s due process complaint notice, dated June 21, 2007, wherein D.D-S. alleged that Ms. Thompson unilaterally removed summer 2007 ESY services at the June 15, 2007 CSE meeting. Application of a Child With a Disability, Appeal No. 09-088, at 5-6.

assistive technology in the form of a scanner/reader; (iii) direct academic instruction in math; (iv) a personal FM system; and (v) in larger settings, to work more closely with teachers. (Id. at 6-7.) He did not recommend that B.D-S. be educated in a residential setting or believe that a residential placement was necessary for her to progress. (Tr. 1294-95.)[7]

On August 8, 2007, B.D-S. was also evaluated by speech-language pathologist Dr. Donna Geffner. (Pl. Ex. P-D.) Dr. Geffner concluded that B.D-S. has an auditory processing disorder that contributes to her language-based learning disability. (Id. at 7.) She stated that B.D-S. "will continue to struggle with clarity of the message, especially in a noisy environment, with short-term memory and word retrieval problems." (Id. at 8.) She recommended (i) continued placement at Landmark; (ii) preferential seating; (iii) testing accommodations; (iv) assistance with note taking and study guides; (v) use of a personal FM unit; (vi) speech-language therapy two times per week; (vii) ESY services; (viii) a multisensory reading program; and (ix) support services for writing. (Id. at 9.)

---

[7] Ms. Kelleher, the assistant director of the preparatory program at Landmark, also testified that B.D-S. did not require a residential setting to succeed. (Tr. 641.)

C.   <u>Continued Enrollment at Landmark</u>

On August 17, 2007, D.D-S. notified the District that B.D-S. would be attending Landmark for the 2007-2008 school year because she believed that the District failed to offer her FAPE. (Pl. Ex. P-G(64).)  Although B.D-S. was in the eighth grade, she was residing and taking classes in the high school.  (Tr. 606.) Her classes included a language arts tutorial, Language Arts, Algebra I,[8] Marine Science, US History I, Reading Literature and Chorus and her grades for the first quarter ranged from B+ to A. (Def. Ex. D-33.)

D.   <u>CSE Review of Updated Evaluations</u>

D.D-S. wrote to the District on October 16 and 24, 2007 requesting an additional CSE meeting to discuss the updated evaluations.  (Pl. Exs. P-C(32), P-C(33).)  The CSE reconvened on December 12, 2007 to review the updated evaluations and to discuss ESY services for summer 2008.  (Pl. Ex. P-N.)  In addition to D.D-S. and B.D-S., there were again representatives from both the District and Landmark.  And both Dr. Davidovicz and Dr. Geffner participated by phone.  (<u>Id.</u> at 1)  They were unable to finish the meeting in the time allotted, so they reconvened on January 15, 2008.  (Pl. Ex. P-N(1).)  The CSE

---

[8] B.D-S. advocated for herself to be placed in a more advanced math class.  (Pl. Ex. P-M(1).)

heard from both doctors as well as B.D-S. and her teachers at Landmark. (Pl. Exs. P-N, P-N(1).)

They also discussed ESY. Ms. Cashman, B.D-S.'s Reading Literature teacher noted that it often takes her a "few days to get back in the swing of things . . . back into the routine and into the structure" after a break. (Pl. Ex. P-N(1), at 15.) However, the CSE chairman, Bruce Kollmar, stated that "there has been nothing brought forth that shows that . . . [B.D-S.] has a problem with regression . . . that is any different than the last time." (Id. at 26.) But, again, because of time constraints, they were unable to finish the session.

E.   Return to Southold

On Friday, March 14, 2008, D.D-S. wrote a letter to the District stating that because their "family [was] financially strapped, [B.D-S.] [would] be attending Southold Junior High on Monday, March 17." (Pl. Ex. P-G(47).) D.D-S. noted her expectation that B.D-S.'s IEP would be "fully implemented." (Id.) Ms. Thompson created a class schedule for B.D-S. that afternoon based on the June 15, 2007 IEP; however, under such short notice, she was unable to arrange for 1:1 tutorial, an up-and-running FM system, and an inclusion Science class by Monday morning. (Tr. 293-96; Pl. Ex. P-G(48).) During the following week, she ordered the FM unit which she

anticipated would be installed within one-to-two weeks, received board approval for a 1:1 tutorial, and rearranged B.D-S.'s schedule to include all inclusion classes. (Tr. 295-96; Pl. Exs. P-G(23).) In the meantime, B.D-S. was offered an "individual" FM unit and a 2:1 tutorial. (Tr. 295; Pl. Ex. P-G(23).)

B.D-S. attended Southold from Monday, March 17 through Wednesday, March 19, 2008. The school was closed on Thursday and Friday for the Easter holiday. On Friday, March 21, 2008, D.D-S. wrote to the District stating that "even though [they were] extremely financially strapped, [B.D-S.] must return to Landmark to receive appropriate benefit for the remainder of the school year" because the District "could not (or failed to) implement her IEP [that] week." (Pl. Ex. P-G(24).)

F.   2008-2009 IEP

Another CSE meeting was scheduled on May 6, 2008 to continue the previous December 2007 and January 2008 meetings. They again discussed the updated neuropsychological and auditory and language processing evaluations and B.D-S.'s eligibility for ESY. (Pl. Ex. P-M(2).) They were again unable to finish the meeting because of time constraints. (Id.)

On May 22, 2008, a subcommittee of the CSE convened to conduct B.D-S.'s annual review and to develop her IEP for the 2008-2009 school year. During the meeting, B.D-S.'s teachers at

Landmark reported on her progress, strengths, weaknesses and present levels of performance. (Pl. Ex. P-M(1).)[9] Adam Hickey, B.D-S.'s academic case manager at Landmark, noted that she was progressing well and "doing things [in the eighth grade] that ninth graders struggle with." (Id.) Ms. Cashman again noted, however, that it would take her a "few days" to get "back on track" after a long break. (Id.) The meeting was adjourned with the expectation that they would reconvene to finalize an IEP, but they never did. (Tr. 318.)

On August 21, 2008, D.D-S. notified the District that it failed to offer B.D-S. FAPE, so she would be sending her daughter to Landmark for the 2008-2009 school year. (Pl. Ex. P-C.) B.D-S. enrolled in Physical Science, Study Skills, US History II, Geometry,[10] Literature, Grammar Composition, and Chorus/Drama. She no longer required a 1:1 tutorial as she did the previous year. (Tr. 588-90.)

---

[9] See, e.g., Tr. 950-51 (testimony of Dr. Geffner stating "I observed some very significant progress"); Tr. 337-38 (testimony of Ms. Thompson stating that B.D-S. made "good" progress and is "extremely happy"); Tr. 607-08 (testimony of Ms. Kelleher stating that B.D-S. made progress in the Landmark program and met her expectations in her subject courses); Tr. 530 (testimony of Mr. Katz stating that B.D-S.'s note-taking and comprehension skills have improved while at Landmark).

[10] The record reflects that Geometry and US History II are part of the tenth grade curriculum. (Tr. 546-47, 652.)

III. <u>Procedural Background</u>

By due process complaint dated January 13, 2009, D.D-S. asserted that the District failed to offer FAPE for the 2007-2008 and 2008-2009 school years. (Pl. Ex. P-A.) The parties proceeded to an impartial hearing before IHO McKeever on March 24, 2009 and, after eight days of testimony, concluded on April 17, 2009. <u>See</u> <u>Application of a Child With a Disability</u>, Appeal No. 09-088, at 15. In a thirty-one page decision dated July 15, 2009 ("IHO Decision"), the IHO concluded that (i) the District offered FAPE for the 2007-2008 school year so Plaintiff was not entitled to tuition reimbursement for the 2007-2008 school year; (ii) the parent was not entitled to tuition reimbursement for the 2008-2009 school year because, although B.D-S. made progress while at Landmark, it was not the least restrictive environment; and (iii) B.D-S. did not qualify for ESY for summer 2008 and was not eligible for compensatory educational services.

Plaintiff then appealed the decision of the IHO to the SRO, who on October 8, 2009, in a thirty-one page, single-spaced decision affirmed the decision of the IHO. <u>Application of a Child With a Disability</u>, Appeal No. 09-088.

On November 16, 2009, Plaintiff filed the present action challenging the decision of the SRO. Plaintiff filed the instant motion for summary judgment on September 9, 2010 and Defendant cross-moved on October 22, 2010.

DISCUSSION

I.   Procedural and Evidentiary Issues

        Prior to addressing the substantive issues, the Court
briefly will discuss the procedural and evidentiary issues
presented by the parties.  Plaintiff requests that the Court (1)
remand the case for a new hearing "due to the fundamentally
unfair manner in which the IHO conducted the hearing" (Pl. Mem.
3), and (2) accept additional evidence in the form of recent
psychological evaluations (Pl. Mem. 20).   For the following
reasons, both requests are DENIED.

    A.   Remand for New Hearing

        Plaintiff asserts that the original hearing before the
IHO was fundamentally unfair because the IHO (1) allowed the
District to cross examine B.D-S. regarding material outside the
scope of direct; (2) allowed the District to call Ms. Cahill as
a rebuttal witness; and (3) denied Plaintiff's application to
submit additional evidence to rebut Ms. Cahill's testimony after
the close of the hearing.   The Court disagrees.   First, the
proceeding was an impartial due process hearing with relaxed
rules of evidence.   Therefore, the IHO was not bound by either
state or federal rules of evidence, and any slight deviation
therefrom does not make the proceeding "fundamentally unfair."
Furthermore, the IHO did not rely on Ms. Cahill's rebuttal
testimony in his decision; so any possible error in permitting

16

it or in precluding Plaintiff's additional evidence was
harmless. Additionally, Plaintiff cites to no case law
supporting remand under these circumstances. <u>Contra</u> <u>H.C. ex</u>
<u>rel. L.C. v. Colton-Pierrepont Cent. Sch. Dist.</u>, 341 Fed. Appx.
687, 691-92 (2d Cir. 2009) (holding that district court was
required to review parent's challenge to SRO's determination
that her child's IEP provided her with FAPE, as required by
IDEA, rather than remand SRO's decision to the IHO). The Court
therefore DENIES Plaintiff's request that the Court remand for a
new hearing.

      B.   <u>Additional Evidence</u>

Plaintiff also asks the Court to accept and consider
additional evidence, beyond the administrative record, in the
form of two evaluations of B.D-S. conducted during the spring
and summer of 2010. Defendant objects that the evidence is
irrelevant. The Court agrees.

The IDEA directs a court reviewing the decision of an
SRO to "receive the records of the administrative
proceedings; . . . <u>hear additional evidence at the request of a</u>
<u>party</u>; and . . . basing its decision on the preponderance of the
evidence, . . . grant such relief as the court determines is
appropriate." 20 U.S.C. § 1415(i)(2)(C) (emphasis added).
"Notwithstanding the 'shall hear additional evidence' language,
appellate courts have construed the statute to provide district

17

courts with discretion to determine whether to hear such evidence." See Handleman v. Bd. of Educ., No. 07-CV-6021, 2007 WL 3076970, at *2 (W.D.N.Y. Oct. 19, 2007) (collecting cases).

Here, Plaintiff is seeking to admit retrospective evidence of B.D-S.'s performance at Landmark to support the proposition that Landmark was an appropriate placement during the 2008-2009 school year. (Pl. Mem. 20.) The First, Third, and Ninth Circuits, as well as some district courts in the Second Circuit, have held that the admission and consideration of such evidence by the court is improper:

> Instead of asking whether the [program] was adequate in light of the [child's] progress, the district court should have asked the more pertinent question of whether the [program] was appropriately designed and implemented so as to convey . . . a meaningful benefit. We do not judge [a program] in hindsight; rather we look to the [program's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer . . . a meaningful benefit.

Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999); accord Carlisle Area Sch. v. Scott P. ex rel. Bess P., 62 F.3d 520, 530 (3d Cir. 1995); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990); J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist., No. 08-CV-6395, ___ F. Supp. 2d ___, 2011 WL 1346845, at *20 n.26 (S.D.N.Y. Mar. 31, 2011); C.B. ex rel. W.B. v. N.Y. City Dep't of Educ., No. 02-CV-4620, 2005 WL 1388964, at *17-18

18

(E.D.N.Y. June 10, 2005); J.R. ex rel. S.R. v. Bd. of Educ., 345 F. Supp. 2d 386, 395 (S.D.N.Y. 2004).

While the Second Circuit has not directly addressed the question of whether district courts can consider retrospective evidence,[11] notwithstanding the views of the other Circuits, it has recently relied on retrospective evidence of a student's progress to uphold a parent's choice of private placement.[12] In Frank G., the Second Circuit upheld the decision of the district court to admit evidence of the child's social and behavioral development, his standardized test results, and his year-end grades that occurred after the due process hearing. 459 F.3d at 362, 367. The additional evidence reviewed by the court, however, concerned the second half of the school year for which the parents were seeking tuition reimbursement. Id. at 362. Similarly, in Kiryas Joel, the court considered post-hearing evidence of the student's progress during the school

---

[11] See D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598-99 (2d Cir. 2005) (recognizing the controversy over whether "it is error to consider retrospective evidence in assessing the substantive validity of an IEP" but declining to rule on it); T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 251 n.1 (2d Cir. 2009) ("This Court has never ruled on whether district courts may consider retrospective evidence in assessing the substantive validity of an IEP[;] . . . [and] [w]e need not do so here.")

[12] See Frank G., 459 F.3d at 366 ("[The child's] social and academic progress, and his score on the Stanford Achievement Test, support the appropriateness of the placement."); Gagliardo, 489 F.3d at 115 ("[A] child's progress [in private placement] is relevant to the Court's review.").

year in question.  2011 WL 1346845, at *20 n.26.  However, the
court there refused to expand the record to include a report of
a special education teacher's observations of the student "made
a full year and a half after the end of the . . . school year at
issue . . . and roughly nine months after the impartial hearing
came to an end" because such observations were irrelevant.  Id.
(citing A.S. ex rel. Mr. W.S. v. Trumbull, 414 F. Supp. 2d 152,
171 (D. Conn. 2006) (holding that, irrespective of the validity
of retrospective evidence generally, evidence pertaining to an
entirely different school year than the one at issue is of
"questionable relevance")).

       The present case is similar to Kiryas Joel in that
Plaintiff is seeking to introduce evaluations conducted over a
year after the end of the 2008-2009 school year in issue and
over a year after the hearings before the IHO and SRO.  The
evaluations are too far removed from the 2008-2009 school year
to be relevant to the determination of whether Landmark was an
appropriate placement for B.D-S. that year.  Therefore,
Plaintiff's request that the Court accept the additional
evidence is DENIED.  As such, the Court will not consider the
2010 evaluations.[13]

---

[13] Defendant submitted an affidavit of Cindy Allentuck to rebut
the 2010 evaluations offered by Plaintiff.  (Fine Aff. Ex. B.)
Since the Court already determined that these evaluations are

II.   Judicial Review of Administrative Determination

     A.   Standard of Review

          While  the  instant  motion  is  styled  as  a  motion  for
summary  judgment,  "the  procedure  is  in  substance  an  appeal  from
an  administrative  determination,  not  a  summary  judgment."   Wall
ex  rel.  Wall  v.  Mattituck-Cutchogue  Sch.  Dist.,  945  F.  Supp.
501,  508  (E.D.N.Y.  1996).   Indeed,  the  motion  "triggers  more
than  an  inquiry  into  possible  disputed  issues  of  fact.   Rather,
the  motion  serves  as  a  'pragmatic  procedural  mechanism'  for
reviewing  a  state's  compliance  with  the  procedures  set  forth  in
IDEA  and  determining  whether  the  challenged  IEP  is  reasonably
calculated  to  enable  the  child  to  receive  educational  benefits."
Lillbask  v.  Conn.  Dep't  of  Educ.,  397  F.3d  77,  83  n.3  (2d  Cir.
2005)  (citations  omitted).   Accordingly,  the  Court  considers
"whether  the  administrative  record,  together  with  any  additional
evidence,  establishes  that  there  has  been  compliance  with  IDEA's
processes  and  that  the  child's  educational  needs  have  been
appropriately  addressed."   Wall,  945  F.  Supp.  at  507.

          The   Court   makes   its   determination   under   the
"preponderance  of  the  evidence"  standard,  while  keeping  in  mind
that   the   scope   of   review   of   the   state's   administrative

---

irrelevant  and  that  it  will  not  consider  them  in  its  analysis,
Defendant's  rebuttal  evidence  is  similarly  irrelevant  and  will
also  be  excluded  from  the  Court's  analysis.

determination is "strict[ly] limited." See Grim v. Rhinebeck
Cent. Sch. Dist., 346 F.3d 377, 380-81 (2d Cir. 2003) (citations
omitted).  "Federal courts reviewing administrative decisions
must give 'due weight' to the administrative proceedings,
'mindful that the judiciary generally lacks the specialized
knowledge and experience necessary to resolve persistent and
difficult questions of educational policy.'"  Id. (quoting
Walczak, 142 F.3d at 129).  Further, "Rowley requires that
federal courts defer to the final decision of the state
authorities, and that deference may not be eschewed merely
because a decision is not unanimous or the reviewing authority
disagrees with the hearing officer." Karl ex rel. Karl v. Bd.
of Educ., 736 F.2d 873, 877 (2d Cir. 1984).

　　　　"Deference is particularly appropriate, when, as here,
the state hearing officers' review has been thorough and
careful." Walczak, 142 F.3d at 129.  However, this deference is
not boundless.  Where the SRO's determination is "unsupported by
the record as a whole and incorrect as a matter of law, [it]
simply [does] not merit deference." Mr. X v. N.Y. State Educ.
Dep't, 975 F. Supp. 546, 588 (S.D.N.Y. 1997).

　　　B.　Tuition Reimbursement

　　　　Parents who believe that the state has failed to
provide FAPE "may, at their own financial risk, enroll the child
in a private school and seek retroactive reimbursement for the

cost of the private school from the state." Gagliardo, 489 F.3d
at 111 (citing Sch. Comm. of Burlington v. Dep't of Educ., 471
U.S. 359, 370, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985)); accord
Mamaroneck, 554 F.3d at 252.  To determine whether parents are
entitled to tuition reimbursement, the Court must engage in a
three-step process.  Mamaroneck, 554 F.3d at 252.  "First, we
examine whether the state has complied with the procedures set
forth in the IDEA.  Second, we consider whether the proposed IEP
is substantively appropriate in that it is reasonably calculated
to enable the child to receive educational benefits."  Id.
(internal quotation marks and citations omitted).  "Only if the
IEP is procedurally or substantively deficient do we reach the
third step and ask whether the private schooling obtained by the
parents is appropriate to the child's needs."  Id. (citing Cerra
v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005)).
"[B]ecause the authority to grant reimbursement is
discretionary, 'equitable considerations [relating to the
reasonableness of the action taken by the parties] are relevant
in fashioning relief."  Frank G., 459 F.3d at 363-64 (second
alteration in original) (quoting Burlington, 471 U.S. at 374;
M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68
(2d Cir. 2000); 20 U.S.C. § 1412(a)(10)(C)(iii)(III)).

Defendant bears the burden of persuasion as to the
appropriateness of the IEP and Plaintiff bears the burden as to

the appropriateness of the private placement.   See N.Y. Educ. Law § 4404(1)(c).

In the present case, Plaintiff seeks tuition reimbursement for the 2007-2008 and 2008-2009 school years.   The Court will address each in turn.

### 1.   2007-2008 School Year

D.D-S. unilaterally placed B.D-S. in Landmark for the 2007-2008 school year, with the exception of three days in March when she returned to Southold.   She seeks reimbursement for Landmark's tuition for the 2007-2008 school year, alleging that B.D-S. was denied FAPE because the IEP developed by the CSE was procedurally and substantively inadequate and the District failed to implement the IEP during the three days B.D-S. returned to Southold.

### a.   Procedural Compliance

"The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.'" A.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d 165, 172 (2d Cir. 2009) (quoting Walczak, 142 F.3d at 129).

Not all procedural inadequacies, however, render an IEP inadequate under IDEA.   See id.   "A procedural violation may lead to the conclusion that a child was denied a FAPE only where

24

the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits." W.S. v. Nyack Union Free Sch. Dist., No. 09-CV-10139, 2011 WL 1332188, at *8 (S.D.N.Y. Mar. 30, 2011) (citing Grim, 346 F.3d 377)); see also Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) ("[P]rocedural flaws do not automatically require a finding of a denial of a FAPE. But procedural inadequacies that individually or cumulatively result in the loss [of] educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of FAPE.").

Plaintiff points out two procedural inadequacies with the IEP: (1) that the District's recommendation was predetermined and (2) that D.D-S. was denied a meaningful opportunity to participate in the decision-making process. Both the IHO and SRO determined that these arguments were without merit. The Court agrees.

Predetermination by a CSE of a child's IEP can amount to a procedural violation of the IDEA if it effectively deprives the parent of meaningful participation in the IEP process. See Kiryas Joel, 2011 WL 1346845, at *30 (citing Nack ex rel. Nack

25

v. Orange City Sch. Dist., 454 F.3d 604, 610 (6th Cir. 2006)).
"The core of the statute is that the development of the IEP be a
cooperative process between the parents and the district, and
predetermination by a district of a child's IEP undermines the
IDEA'S fundamental goal to give parents a voice in the
educational upbringing of their children." Id. (internal
quotation marks and citations omitted).

Plaintiff alleges that B.D-S.'s IEP was predetermined
because "after Landmark staff and the parent carefully discussed
[B.D-S.'s skill level, goals and benchmarks] (allowing full
opportunity for Southold staff to participate), the Southold
director of special education simply ignored the entire
substance of the meeting and made an apparently predetermined
recommendation, that 'B.D-S. return to an inclusion program [in
the public school] with 1:1 tutorial and a small group skills
class to support her.'" (Pl. Mem. 10 (quoting Tr. 794).)
Contrary to Plaintiff's assertion, however, Mr. Pulkinnen
testified and the minutes from the CSE meeting indicate that the
District's staff did participate in the meeting:

> The Landmark teachers presented the current
> performance information and [Mr. Pulkkinen]
> asked everybody on the team, including the
> Southold folks, to look at the suggested
> annual goals and the benchmarks and review
> those together and ask any questions or come
> to an agreement that these were appropriate
> goals and benchmarks. We did so for each
> goal area and each subject.

(Tr. 792-93.)   The fact that the District's staff did not contribute significantly to the discussion is of no merit because: first, the conversation was appropriately dominated by B.D-S.'s then-current teachers as they were the individuals in the best position to summarize her progress and weaknesses (Tr. 792-93), and second, the District agreed with the goals proposed by the Landmark representatives (id. at 793).   In fact, the goals proposed by Landmark and discussed at the meeting were all incorporated into the final IEP.   (Pl. Ex. P-H, at 34.)

Additionally, there is evidence that the District remained open-minded at the CSE meeting.   The District's ultimate recommendation was based on the information presented by the Landmark team--primarily on B.D-S.'s strong test scores-- and included the use of programs and devices like Kurtzweil software, the Read Naturally program, and an FM system (id. at 33-34)--all of which were programs and devices not commonly used in the District but were incorporated in the IEP based on Landmark's recommendations at the meeting.[14]   See Kiryas Joel,

---

[14] In response to Landmark's suggestion and B.D-S.'s request to have textbooks in alternate formats, Ms. Thompson suggested that the Kurtzweil software be installed on her laptop.   (See Pl. Ex. P-H, at 33 ("We will be having a trainer come to the district to provide more training for the teachers before school begins in September.")   With respect to the Read Naturally program used by Landmark, Ms. Thompson stated "I am not familiar with the program that you use but I will certainly make myself.   The Read

2011 WL 1346845, at *30 ("Courts have rejected predetermination claims where . . . there was credible evidence that the school district was open-minded at the IEP meeting." (citing Hanson ex rel. Hanson v. Smith, 212 F. Supp. 2d 474, 486 (D. Md. 2002); Doyle v. Arlington Cnty. Sch. Bd., 806 F. Supp. 1253, 1261-62 (E.D. Va. 1992)).   There is no evidence other than the recommended placement itself to suggest that the District had made a binding determination as to B.D-S.'s placement prior to the meeting, and Plaintiff has presented no reason to overturn the IHO and SRO's ruling on those grounds.

Further, courts have repeatedly rejected predetermination claims where, as here, the parents actively and meaningfully participated in the development of the IEP.   Id. (citing M.M. ex rel. A.M. v. N.Y. City Dep't of Educ., 583 F. Supp. 2d 498, 506-07 (S.D.N.Y. 2008); N.L. ex rel. Mrs. C. v. Knox Cnty. Schs., 315 F.3d 688 (6th Cir. 2003); Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1036 (3d Cir. 1993)).   Plaintiff argues that she was denied meaningful participation because (i) she did not agree with the IEP that was ultimately adopted and (ii) she allegedly did not understand the services that were to be offered in the District because the IEP did not reflect what was discussed at the CSE meeting.   (Pl.

---

Nationally program, I will make myself familiar with it and offer that to [B.D-S.] also." (Id. at 34.)

Mem. 10.)  Both arguments fail.  <u>First</u>, "[n]othing in the IDEA
requires the parents' consent to finalize an IEP.  Instead, the
IDEA only requires that the parents have an opportunity to
participate in the drafting process."  <u>A.E. v. Westport Bd. of
Educ.</u>, 463 F. Supp. 2d 208, 216 (D. Conn. 2006).  <u>Second</u>, the
CSE meeting minutes contradict Plaintiff's assertion that the
IEP did not reflect the program announced at the meeting.  The
meeting minutes show that Ms. Thompson discussed, at length, the
details of the program proposed by the District--that "B.D-S.
return to an inclusion program [in the public school] with 1:1
reading tutorial and a small group skills class to support her"
(Tr. 794; Pl. Ex. P-H at 33-34.)--and that D.D-S. provided a
lengthy response detailing why she believed such an inclusion
program was inappropriate.  The final IEP reflected exactly what
was announced at the meeting--placement in inclusion classes
with daily resource room support and 1:1 reading tutorial.  (Pl.
Ex. P-B(6), at 8.)  Plaintiff's statement to the contrary is
disingenuous and lacks any support in the record.[15]

_____

[15] Plaintiff also asserts that although she knew that there was
to be a general education teacher and a special education
consultant in each of B.D-S.'s "inclusion" classes, it was
unclear from the meeting whether B.D-S. was categorized as a
general or special education student.  (Cuddy Aff. ¶¶ 45-47.)
The distinction, however, does not appear to be relevant.  B.D-
S. was placed in inclusion classes, with two teachers:  "If she
needed help, she would have been given help.  That's why she was
placed in the inclusion classes so there would be two teachers."

Finally, looking at the complete record, there is no evidence to suggest that the District deprived D.D-S. of a meaningful opportunity to participate in the process. She attended and actively participated in the CSE meeting voicing her educational concerns for the upcoming school year. She followed-up with the school because she did not believe that the District's IEP "exactly reflect[ed] the meeting." Application of a Child With a Disability, Appeal No. 09-088 (citing Pl. Ex. RR). She advocated and obtained approval and funding for additional neuropsychological and auditory and language processing evaluations and succeeded in having the District schedule other CSE meetings to discuss the updated evaluation reports. (Id.) And she recommended and fervently campaigned for placement at Landmark.

b.  Substantive Adequacy

The Court must now determine whether the IEP was substantively adequate. An IEP is substantively adequate if it "provide[s] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Rowley, 458 U.S. at 203. The education provided

_____

(Tr. 361.) Additionally, D.D-S. was given an opportunity to ask questions and comment, which she did (Pl. Ex. P-H, at 34-40), and she never once expressed concern or inquired about whether B.D-S. was considered an "inclusion" student. She fully participated in the meeting, and any assertion that she was denied a meaningful opportunity to participate is unfounded.

need only be "appropriate,"--likely to produce progress, not regression--and "not one that provides everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 132 (citations omitted); see also Watson ex rel. Watson v. Kingston City Sch. Dist., 325 F. Supp. 2d 141, 144 (N.D.N.Y. 2004) ("While the IDEA requires districts to provide appropriate education to disabled students, this is not necessarily synonymous with offering disabled students the best educational opportunities available.").

        "To conduct an independent review of the IEP at issue without 'impermissibly meddling in state educational methodology,' the Court 'must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan.'" Omidian v. Bd. of Educ., 05-CV-0398, 2009 WL 890625, at *25 (N.D.N.Y. Mar. 31, 2009) (quoting Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir. 1997); Walczak, 142 F.3d at 130). "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." Cerra, 427 F.3d at 195.

        Plaintiff argues that the IEP was not substantively adequate because the IEP did not meet B.D-S.'s needs in that: (1) it did not provide for small classes and (2) it did not

incorporate the recommendations in the subsequent evaluations into the IEP. Again, both arguments fail.

First, although there is ample evidence to support the fact that B.D-S. would benefit from a larger class size, that is not the issue. See Westport, 463 F. Supp. 2d at 221 ("The IDEA . . . does not require a school district to pay for a private school education simply because that opportunity would be ideal for the student. It requires only that a school board provide each student a FAPE, that is, a basic opportunity to receive an educational benefit.") The issue is whether she can make meaningful progress in a class of 20-23 students with two teachers, modified homework and testing conditions, 1:1 reading tutorial, daily resource room and the additional classroom supports described above. The IHO concluded, and the SRO affirmed, that she could. The Court agrees.

There is objective evidence indicating that she would likely progress in that setting, including the progress she made in the District's program prior to transferring to Landmark (e.g. Tr. 223, 230-31, 242, 256-57); her performance at or above grade level in almost every area tested (Pl. Ex. P-D(1)); the additional classroom support and modifications tailored to meet

her specific needs;[16] and the fact that the 2007-2008 IEP was similar to a prior IEP that generated some progress, <u>see</u> <u>Thompson R2-J Sch. Dist. v. Luke P.</u>, 540 F.3d 1143, 1153-54 (10th Cir. 2008) (stating that, although not dispositive, an IEP modeled on prior IEPs that succeeded in generating some progress is evidence that the current IEP was "reasonably calculated to continue that trend"), <u>cert</u>. <u>denied</u>, 129 S. Ct. 1356, 173 L. Ed. 2d 590 (2009); <u>Application of a Child with a Disability</u>, Appeal No. 07-119, at 13 (prior decision of SRO stating that B.D-S. "was successful" under the IEP in place during the portion of the 2006-2007 school year she spent at Southold).

        <u>Second</u>, the Court concurs with the IHO and SRO's rationale supporting their conclusion that the district properly reviewed B.D-S.'s updated evaluations. The District agreed to secure and fund an updated neuropsychological evaluation and an updated auditory and language processing evaluation. The CSE then reconvened on December 12, 2007, January 15, 2008, and May 6, 2008, where the parent and the neuropsychologist and speech-language pathologist who conducted the updated evaluations participated in lengthy discussions regarding the results and

---

[16] For example, Dr. Davidovicz stated that "[i]n larger settings, [B.D-S.] needs to be worked with more closely" and "[a] personal FM system continues to be useful" (Pl. Ex. P-D(1) at 7.), and the IEP provided for 1:1 reading tutorial, daily resource room, an in-class special education teacher, and an FM system.

recommendations contained in their reports. (Pl. Exs. P-N, P-N(1), P-M(2).) The Court agrees with the IHO and SRO that the CSE did not need to revise the IEP to incorporate the recommendations in these new evaluations because most were already included.[17]

c. <u>Failure to Implement</u>

Plaintiff also argues that the District denied B.D-S. a FAPE when it failed to fully implement the IEP during the three days that B.D-S. attended Southold in March 2008. "[A] party challenging the implementation of an IEP must show more than a <u>de</u> <u>minimis</u> failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant

---

[17] For example, Dr. Davidovicz recommended: (i) extended time for homework and testing; (ii) assistive technology in the form of a scanner/reader; (iii) direct academic instruction in math; (iv) personal FM system; and (v) in larger settings, to work more closely with teachers. (Pl. Ex. P-D(1).) The IEP provided for (i) modified homework assignments and testing accommodations including, but not limited to, extended time; (ii) use of laptop, Kurzweil Software and Read Naturally program; (iii) additional support of special education teacher for English, Math, Social Studies and Science; (iv) personal FM unit; and (v) daily resource room and 1:1 reading tutorial. (Pl. Ex. P-B(6).) Dr. Geffner recommended: (i) continued placement at Landmark; (ii) preferential seating; (iii) testing accommodations; (iv) assistance with note taking and study guides; (v) personal FM unit; (vi) speech-language therapy two-times per week; (vii) ESY; (viii) multisensory reading program; and (ix) support services for writing. (Pl. Ex. P-D.) Aside from continued placement at Landmark, ESY, and the speech-language therapy, all of Dr. Geffner's recommendations were already included in the IEP.

provisions of the IEP." Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir. 2000), cited in A.P. v. Woodstock Bd. of Educ., 370 Fed. Appx. 202, 204 (2d Cir. 2010). Specifically, Plaintiff states that "while the IEP recommended an FM trainer, no such trainer was actually provided." (Pl. Mem. 11.)

The record shows that D.D-S. contacted the District on Friday, March 14, 2008, to advise the school that B.D-S. would be returning to Southold on Monday, March 17 (Pl. Ex. P-G(47)) and that the District made every effort to implement the IEP by March 17 despite the very short notice. (Pl. Ex. P-G(48); Tr. 293-98.) Any facets that were not completely implemented by March 17 were in the process of being corrected when D.D-S. wrote back to the District on March 21, 2008 stating that B.D-S. would be returning to Landmark. (Tr. 295-96; Pl. Exs. P-G(23), P-G(24).) Although no FM system was available to B.D-S. during the three days she returned to Southold, the District made arrangements to have the system operational within one-to-two weeks and offered to provide B.D-S. with an "individual FM device" in the interim. (Tr. 297; Pl. Ex. P-G(23).) As such, the Court agrees with the IHO and SRO that, given the short notice, these minor deviations from the IEP for a three-day period did not constitute a failure to implement a substantial portion of the IEP.

The Court concludes that the IEP was procedurally and substantively appropriate and the District did not deny B.D-S. FAPE during the 2007-2008 year.  Therefore, the Court need not address the adequacy of Landmark for the 2007-2008 school year, and the decision of the SRO upholding the IHO's denial of tuition reimbursement for the 2007-2008 school year is affirmed.

2.   2008-2009 School Year

D.D-S. also seeks tuition reimbursement for her unilateral placement of B.D-S. at Landmark for the 2008-2009 school year.  The District concedes that it did not provide B.D-S. with FAPE for the 2008-2009 school year (Def. Opp. 12); therefore, the only issue is whether Landmark was an appropriate placement for the year in question.

"Parents who seek reimbursement bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate." Gagliardo, 489 F.3d at 112. Subject to certain limited exceptions, "the same considerations and criteria that apply in determining whether the . . . District's placement is appropriate should be considered in determining the appropriateness of the parents' placement." Frank G., 459 F.3d at 364. "[T]he issue turns on whether a placement--public or private--is 'reasonably calculated to enable the child to receive educational benefits.'" Id. (quoting Rowley, 458 U.S. at 207). "A private

36

placement meeting this standard is one that is 'likely to produce progress, not regression.'" Gagliardo, 489 F.3d at 112 (quoting Walczak, 142 F.3d at 130). "However, academic success at the private placement alone is not sufficient," E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist., 742 F. Supp. 2d 417, 444 (S.D.N.Y. 2010), and the Court must find that a preponderance of the evidence supports the finding that the placement at Landmark provided B.D-S. with a program specifically designed to meet her unique needs. See Gagliardo, 489 F.3d at 115.

Additionally, the IDEA requires that "special education and related services must be provided in the least restrictive setting consistent with a child's needs." Walczak, 142 F.3d at 122. And while unilateral parental placements need not meet state education standards and are not subject to the same mainstreaming requirements as a school district, Frank G., 459 F.3d at 364; M.S. ex rel. S.S. v. Bd. of Educ., 231 F.3d 96, 105 (2d Cir. 2000), abrogated on other grounds by Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 57–58, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005), the "IDEA's requirement that an appropriate education be in the mainstream to the extent possible remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate," M.S., 231 F.3d at 105; accord Pinn ex rel. Steven

37

P. v. Harrison Cent. Sch. Dist., 473 F. Supp. 2d 477, 482-83
(S.D.N.Y. 2007) ("While failure of a parent to put a student in
the [least restrictive environment] is not a bar to tuition
reimbursement, it is a factor which may be considered by a
hearing officer." (citation omitted)).

The District asserts that Landmark is not an
appropriate placement because (1) there is no objective evidence
that B.D-S. made progress at Landmark during the 2006-2007 and
2007-2008 school years and (2) it is not the least restrictive
environment ("LRE"). The Court will address each in turn.

a. Progress at Landmark

"An assessment of educational progress is a type of
judgment for which the district court should defer to the SRO's
educational experience, particularly, where, as [is] the case
here, the district court's decision [is] based solely on the
record that was before the SRO." M.S., 231 F.3d at 105. The
Court finds that there is ample evidence in the record to
support the IHO's conclusion, which was upheld by the SRO, that
B.D-S. made progress while at Landmark;[18] therefore, the Court

---

[18] See, e.g., Tr. 950-51 (testimony of Dr. Geffner stating "I
observed some very significant progress"); Tr. 337-38 (testimony
of Ms. Thompson stating that B.D-S. made "good" progress and is
"extremely happy"); Tr. 607-08 (testimony of Ms. Kelleher
stating that B.D-S. made progress in the Landmark program and
met her expectations in her subject courses); Tr. 530 (testimony

will not engage in an independent analysis and will afford appropriate deference to their decision.

> b.   <u>Least Restrictive Environment</u>

Progress in a unilateral placement, however, is not dispositive, and the Court must consider whether "the totality of the circumstances" demonstrates that the "placement reasonably serves a child's needs." <u>Frank G.</u>, 459 F.3d at 364. Contrary to Plaintiff's assertion, the restrictiveness of the unilateral placement is relevant to the discussion, and courts in the Second Circuit have upheld the denial by an SRO of tuition reimbursement when the unilateral placement was too restrictive. <u>See</u>, <u>e.g.</u>, <u>M.S.</u>, 231 F.3d at 105 (overturning district court because it did not grant due deference to the SRO's "supportable finding" that the parents' private placement was inappropriate, in part, because it did not allow the child to be mainstreamed to the extent possible); <u>S.H.</u>, 2011 WL 609885, at *10 (denying tuition reimbursement when "Plaintiff has not demonstrated that it was necessary for [the student] to be placed in a residential program solely for learning disabled students in order to obtain educational benefits"); <u>Schreiber v. E. Ramapo Cent. Sch. Dist.</u>, 700 F. Supp. 2d 529, 551 (S.D.N.Y. 2010) (finding that a "private placement can be appropriately

_____

of Mr. Katz stating that B.D-S.'s note-taking and comprehension skills have improved while at Landmark).

rejected" when there is no indication that the placement would eventually transition the student into a less restrictive placement); Pinn, 473 F. Supp. 2d at 482-83 (finding that SRO did not err in concluding that private placement was inappropriate considering, inter alia, that the student did not have the opportunity to take mainstream classes).

In the present case, the SRO affirmed the IHO's conclusion that Landmark was "overly restrictive for [B.D-S.] and otherwise inappropriate" because it completely segregates her from her typically developing peers, is out-of-state and far removed from her community, and given her well-developed academic skills is not required to meet her education needs. Application of a Child with a Disability, Appeal No. 09-088, at 30 (citing IHO Decision 24). His conclusion is supported by a preponderance of the evidence: B.D-S.'s general abilities fall in the bright-to-normal range at 90th percentile (Pl. Ex. P-D(1), at 3); she was on Landmark's high school campus as an eighth grade student and taking tenth grade courses (Geometry and History II) as a ninth grade student (Tr. 588, 606; IHO Decision 22); she advocated for herself to be placed in a more sophisticated math class (Def. Ex. D-35; Pl. Ex. P-M(1)); and according Mr. Hickey, she was "doing things [in the eighth grade] that ninth graders struggle with" (Pl. Ex. P-M(1)). Additionally, Ms. Kelleher, the assistant director of the

preparatory program at Landmark, testified that mainstreaming a student is not one of Landmark's goals (Tr. 609-10) and that B.D-S. did not require a residential placement to make academic progress (Tr. 641). As such, placement in a such a residential program, out-of-state, where she is managed from the moment she wakes up to the moment she goes to bed (Tr. 583-84, 689-90), with no opportunity to interact academically with her typically developing peers in mainstream classes (Tr. 610) is, in the words of the IHO, "particularly troubling [given] that [B.D-S.] is capable of performing at grade level in most academic areas with appropriate education supports" (IHO Decision 21). Landmark is overly and unnecessarily restrictive; therefore, the Court affirms the SRO's denial of tuition reimbursement for the 2008-2009 school year.

     C.   <u>Eligibility for Extended School Year Services</u>

     D.D-S. also asserts that the District denied B.D-S. ESY services for the summer of 2008 and seeks an award of compensatory educational services. (Pl. Mem. 18-19.) ESY services are defined as:

> "special education and related services
> that (1) [a]re provided to a child with a
> disability . . . [b]eyond the normal school
> year of the public agency; . . . [i]n
> accordance with the child's IEP;
> and . . . [a]t no cost to the parents of the
> child; and (2) [m]eet the standards of the
> [state education agency]."

34 C.F.R. § 300.106.  Students are entitled to ESY services if "because of their disabilities, [they] exhibit the need for a 12-month service and/or program provided in a structured learning environment of up to 12 months duration in order to prevent substantial regression." 8 N.Y.C.C.R.R. 200.6(k)(v) (emphasis added).  Substantial regression is defined as:

> a student's inability to maintain developmental levels due to a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives mastered at the end of the previous school year.

8 N.Y.C.C.R.R. 200.1(aaa) (emphasis added).

While no court in the Second Circuit has expanded on what constitutes an "inordinate period of review," SROs in New York have consistently applied the standard articulated by the New York State Education Department's Office of Special Education:

> A student is eligible for a twelve-month service or program when the period of review or reteaching required to recoup the skill or knowledge level attained by the end of the prior school year is beyond the time ordinarily reserved for that purpose at the beginning of the school year. The typical period of review or reteaching ranges between 20 and 40 school days. As a guideline for determining eligibility for an extended school year program, a review period of eight weeks or more would indicate that substantial regression has occurred.

42

"Extended   School   Year   Programs   and   Services   Questions   and Answers," http://www.p12.nysed.gov/specialed/finance/2011QA.pdf (emphasis  added); see  also  Application  of  a  Child  with  a Disability, Appeal No. 08-078, at 21-22; Application of a Child with a Disability, Appeal No. 07-089, at 8 n.3.   The burden of production rests with the parent of the child seeking ESY.   See Brennan v. Reg'l Sch. Dist. No. 1 Bd. of Educ., 531 F. Supp. 2d 245, 273 (D. Conn. 2008).

While D.S-S. has produced some evidence of regression, she has failed to produce any evidence that B.D-S.'s regression was  atypical--that  her  academic  skills  would  regress  after summer vacation or another extended break to the point that they could  not  be  recouped  in  twenty-to-forty  school  days.    A preponderance  of  the  evidence  shows  the  contrary:   her  grades for the first quarter of the 2007-2008 school year at Landmark-- the quarter immediately following summer break--range from B+ to A (Pl. Ex. D-33); her progress reports from the same time period do  not  mention  any  skills  that  she  lost  over  the  summer vacation; and Mrs. Cashman stated that it would only take her "a few  days"  "to  get  back  on  track"  after  a  vacation  (Pl.  Ex.  P-M(1); see also Pl. Ex. N(1), at 15-16 (other Landmark teachers noting that it would take a "few days to get back into the swing of things").   There being no evidence of substantial regression, the  Court  affirms  the  holding  of  the  SRO  that  B.D-S.  was

ineligible for ESY.  Plaintiff, therefore, is not entitled to an award of additional services.

<u>CONCLUSION</u>

For the foregoing reasons, the Court affirms the decision of the SRO denying Plaintiff tuition reimbursement for the 2007-2008 and 2008-2009 school years and compensatory educational services for summer 2008.  As such, Plaintiff's motion for summary judgment is DENIED, and Defendant's cross motion for summary judgment is GRANTED.  The Clerk of the Court is directed to enter judgment for Defendant and mark this matter closed.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:     September 2, 2011
           Central Islip, New York

44